## *The guardianship of* MARY ELGIN.

THE intent of the legislature has been to leave a female guardian of minors, liable to removal by the Surrogate, after her own marriage, lest her duties to the child might be forgotten in her obedience or affection to her husband. Without a strong case, however, this Court will not interfere to deprive a mother of guardianship.

THE SURROGATE. This is an application to revoke the letters of guardianship issued to Mary Elgin, on the person and estate of her daughter, Mary Elgin, junior, an infant of thirteen years of age. It appears that the mother has, since the issuing of these letters, intermarried with James Frost. The petitioner is a brother of the deceased father of the infant; and the application is made under the 34th section of the act of 1837 (*chapter* 460), which provides:

"In case a woman marries, after being appointed an executrix, administratrix, or guardian, the Surrogate, on the application of any party interested, shall have power to revoke the appointment."

Many reasons for such a revocation which existed at the time of this enactment, over thirty years ago, have disappeared in the progress of our later legislation.

In 1837, when this law was enacted, a married woman

could not be appointed an administratrix or a guardian. She could only be an executrix with the consent of her husband, and this consent was required up to 1867. (*See chapter* 782, *Laws of* 1867, § 2.) . She was allowed by the act of 1863, to become an administratrix, provided her husband's consent was given. (*Laws of* 1863, *chapter* 362, § 4.) And the act of 1867 (as above) dispensed with the husband's consent as to administration, also. Married women thus became entitled to the same rights as to the care of the estates of deceased persons, as single ones.

In the matter of guardianship, starting with the act of 1837 (above cited), we find no change attempted until the act of 1860, (*chap.* 90, § 9), which recognized for the first time the legal rights of a married woman in her own child. It prohibited the father from appointing a testamentary guardian, as he could do theretofore, contrary to the mother's wishes. Then came the act of 1867 (as above), which made a married woman equally eligible to the guardianship of a child with a single one. But this last act does not in words repeal the section of the act of 1837, which gave the Surrogate the power to revoke her guardianship in the event of a woman's contracting a new marriage after her appointment as guardian.

It seems probable that it was by intention, and not by omission, that this power was still left to the Surrogate by the act of 1867. The law intended to exercise a proper caution for the benefit of the infants. It was feared by our law makers, that a mother, in forming a new alliance, might be induced to neglect, ill treat or place under improper influences, the children of her previous husband. Though it was intended to remove all legal disqualifications which appertained to her status as a married woman, there was a wholesome jealousy least the duties to the child might be forgotten in her obedience or affection to her new husband. The power to revoke her control, and to substitute the relatives of the child's

own father, is therefore wisely retained in judicial hands; but it is a power to be most carefully and sparingly exercised.

In the present case, there is no adequate reason shown why Mrs. Frost should lose the control of her child. The person of the ward appears to be well cared for, and the accounts of the guardian show that the property of the ward is well invested. No ill treatment is proven against either the mother or the stepfather. And without a strong case, this Court will not interfere to deprive a mother of the custody and control of her child and her child's property.